Filed 5/5/22  In re M.S. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re M.S., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E077631 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ1600053) |
| v. | OPINION |
| C.H. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Cheryl C. Murphy, Judge.  Affirmed.

Elena S. Min, under appointment by the Court of Appeal, for Defendant and Appellant C.H.

Julie E. Braden, under appointment by the Court of Appeal, for Defendant and Appellant I.S.

1

Gregory P. Priamos, County Counsel, Teresa K.B. Beecham and Prabhath D. Shettigar, Deputy County Counsel, for Plaintiff and Respondent.

On August 2, 2021, the juvenile court terminated parental rights to M.S. under Welfare and Institutions Code[1] section 366.26 and selected adoption as the permanent plan. On appeal, C.H. (mother) and I.S. (father) contend the beneficial parent-child relationship exception applies to the termination of their rights. (§ 366.26, subd. (c)(1)(B)(i).) Because the record fails to demonstrate the kind of deep bond required to come within that exception, we conclude the court properly found that it does not apply. We therefore affirm.

## I. PROCEDURAL BACKGROUND AND FACTS

### A. *Mother's Background.*

Mother completed the 11th grade but did not graduate from high school. Mother has three older children (M.S.'s half brothers).[2] In a prior dependency action initiated by the Riverside County Department of Public Social Services (the department), mother failed to reunify with M.S.'s half brothers.[3]

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] M.S.'s half brothers are not subjects of the underlying dependency case or this appeal; they are mentioned where relevant or for context.

[3] The family was also the subject of a prior child welfare referral in January 2014 based on law enforcement's discovery of methamphetamine and packing materials in the family home, and its uncleanliness. The referral was closed after the father (whose name was not disclosed in the record) said he had made a mistake trying to make money illegally to provide a better life for his family.

In 2019, mother became pregnant with M.S. She began prenatal care at 12 weeks, but she had limited visits with her doctor and was homeless. At the start of the Covid-19 pandemic, she moved in with her mother (the grandmother).

*B.     Detention.*

M.S. was born in July 2020. She came to the attention of the department when it received an immediate response referral from hospital personnel indicating mother had tested positive for amphetamines and methamphetamine at delivery and had not been able to respond to M.S.'s needs, requiring M.S. be moved to the neonatal intensive care unit. Mother acknowledged her use of methamphetamine for several years and admitted that she had used two days earlier. She was encouraged to visit and bond with the baby, but she never left her room. She identified M.S.'s father but refused to provide identifiable information.

The department visited the grandmother's home. She stated she had legal guardianship over two of M.S.'s half brothers, and mother had been staying with them since mid-March 2020; she denied observing mother being under the influence. Mother's room at the grandmother's home had a twin-size bed, a bassinet, diapers, and baby clothes. The department identified the grandmother as the placement home for M.S. given her home was already certified for placement for the older half brothers.

On July 10, 2020, the department filed a dependency petition under section 300, subdivisions (b)(1) (failure to protect) and (g) (no provision for support); it was later amended to correct the case number. The petition alleged: (1) M.S. was at substantial risk of serious physical harm due to mother's chronic and unresolved history of abusing

3

controlled substances (amphetamines & methamphetamine) including at the time of M.S.'s birth; (2) mother lacked resources to provide the necessary care for M.S.; (3) mother had a transient lifestyle; (4) mother failed to benefit from prior reunification services regarding M.S.'s half brothers, in that they were removed from her care; and (5) father's whereabouts were unknown.

On July 13, 2020, M.S. was detained, and the juvenile court ordered the following: (1) reunification services, supervised visitation, and random drug testing for mother; (2) M.S. be placed with the grandmother when appropriate; (3) mother was not to reside with the grandmother; and (4) father was to be located. Mother confirmed the identity of the biological father as I.S.

C.      *Jurisdiction/Disposition Reports and Hearing.*

In the jurisdiction/disposition report filed July 29, 2020, the department recommended that the juvenile court deny family reunification services to mother (§ 361.5, subd. (b)(10), (b)(13)) and father (§ 361.5, subds. (a), (b)(1)) and set a section 366.26 hearing to establish a permanent plan of adoption within 120 days. The grandmother was considered for placement of the child, but it was on hold due to concerns regarding an adult in her home. Mother refused to relinquish her parental rights and stated that she would address all concerns and work with the department to reunify with the child. Because she had failed to engage in services during her pregnancy, and she had not enrolled in any treatment services since giving birth, the social worker opined that "it is unknown if the mother will be able to adequately address her substance abuse issues and be able to provide the child with a safe and stable home."

4

According to the jurisdiction/disposition addendum report filed September 4, 2020, the department maintained its prior recommendations. The foster mother asked to combine the two, hourly visits between mother and the child into one two-hour visit because mother had difficulty arriving on time. Mother was not opposed to the change because she was beginning substance abuse treatment sessions and was searching for employment. Nonetheless, mother's visitation remained inconsistent. On August 26, 2020, the social worker conducted an unannounced visit at the grandmother's home. The social worker opined that the grandmother was not being truthful about the number of people living there or her grandsons' use of marijuana. Mother was informed that the department would not move forward with placement until the grandmother set boundaries for extended relatives' occupancy of her home and a new evaluation was completed. The department remained unable to verify mother's housing because she failed to provide her current address. Father's whereabouts remained unknown.

A contested jurisdiction hearing was held on September 10, 2020; neither parent appeared. The juvenile court sustained the allegations in the amended petition and set a contested disposition hearing.

According to an addendum report filed September 23, 2020, the department maintained its prior recommendations based on mother's history of chronic drug use, failure to provide evidence of housing and appropriate provisions for the child, and failure to enroll in a substance abuse treatment program, along with father's absence from the child's life. The social worker spoke with the child's caregiver who stated that, as of September 18, mother had missed two weekly visits; however, when visitation occurred it

5

went well. M.S. no longer experienced withdrawal issues. The caregiver was interested in long-term placement. Mother had not enrolled in a substance abuse program and had failed to respond to the social worker's attempts to contact her.

On September 28, 2020, the juvenile court removed physical custody from the parents, denied reunification services to mother under section 361.5, subdivision (b)(10) and (b)(13), denied reunification services to father under section 361.5, subdivision (a), and set a section 366.26 hearing.

D.      *Section 388 Petition, Section 366.26 Report, and Addendum Reports.*

On December 28, 2020, mother filed a section 388 petition requesting the child be placed with the "grandmother as a direct placement, as that is the mother's preference and a hearing under . . . [section] 361.3 is warranted." Mother claimed that this placement was in the child's best interests because she "would have the opportunity to be raised with siblings." The hearing on the petition was set for January 28, 2021.

According to the section 366.26 report filed January 14, 2021, the department recommended termination of parental rights and a permanent plan of adoption. Following M.S.'s birth, she went through a few weeks of methamphetamine withdrawal symptoms; however, she was now healthy and developmentally on track. On December 4, 2020, she was moved to a permanent adoptive placement, where she "appear[ed] very engaged with the adoptive parents and their children." On December 30, 2020, the social worker spoke with the grandmother who presented with slurred speech and was unable to respond fully to questions regarding who was staying in her home. Although she had

6

moved to a new home, she had not replied to the department's attempts to schedule the annual assessment of her home required for placement of M.S.'s half brothers.

The social worker described mother's visitation as appropriate, albeit "sporadic," with no concerns regarding her behavior or sobriety. Since the child had been placed in an adoptive home on December 4, 2020, mother had ignored the department's requests to schedule visitation and offered no information regarding the services she had completed. The department expressed concern that M.S. would be at a high risk of abuse or neglect if returned to mother's care.

In the addendum to the section 366.26 report filed January 15, 2021, the department maintained its prior recommendations and attached the preliminary adoption assessment for M.S.'s caregivers. The caregivers are in their early 40's, have one biologically child (age 11), two adopted children (ages 7 & 5), can meet M.S.'s physical, emotional, and academic needs, and want to provide her with a loving and stable home. M.S. was bonded and attached to the caregivers and their children.

On January 22, 2021, the department filed a report in response to mother's section 388 petition and as an addendum to the section 366.26 report; the department recommended denying the section 388 petition, terminating parental rights, and adoption as the permanent plan. The department reported the grandmother was "not being truthful" about the individuals living in her home. According to the social worker, mother denied living with the grandmother but stated that she did not know the Rialto address where she was staying. Regarding father, mother initially stated that she "rarely sees him or talks with him." However, when questioned about the "hickey" on her neck,

7

she indicated father had made it and admitted they "sometimes get together" and "hang out at the park." On January 13, 2021, father called the department to schedule an interview. He was provided notice of the section 366.26 hearing and was informed the social worker would contact him. Father failed to answer the social worker's repeated calls and messages.

On January 28, 2021, mother requested a contested section 366.26 hearing. The juvenile court set a date (Mar. 23, 2021) for the combined sections 388/366.26 hearing. The court ordered a DNA/paternity test for the child and father and authorized visitation upon establishing paternity. Sibling visitation was authorized on the condition no one was under the influence of marijuana. The parents' educational rights and developmental-services decisions for M.S. were transferred to her caregivers.

On March 5, 2021, another addendum report for the section 366.26 hearing was filed. Between January 14 and February 26, 2021, the department made 14 attempts to contact father to schedule a paternity test; however, he never answered the calls or responded to the social worker's messages. Father never asked for visitation or made himself available for paternity testing. Mother failed to provide any information as to the services she had completed, failed to consistently visit M.S., and was "not forthcoming as to her relationship with the father and her current living situation." The department, therefore, maintained that if M.S. was returned to mother's care, she "would be at high risk of abuse and neglect." Regarding placement of the child with relatives, the department was only aware of the grandmother, and her home could not be assessed due to a pending investigation into allegations of general neglect based on marijuana usage.

The social worker stated that both mother and the grandmother "have shown a pattern of dishonesty with the [d]epartment." As for M.S., she was thriving in her current placement, and her caregivers were committed to adopting her. The department reiterated its request to deny mother's section 388 petition, terminate parental rights, and select adoption as the permanent plan.

On March 11, 2021, mother provided her current mailing address, and father's address was listed as the county jail. The combined sections 388/366.26 hearing was continued to April 26, 2021.

In the addendum report filed April 21, 2021, the department maintained its prior recommendations. It noted a mutual bond between M.S. and her caregivers. Regarding placement with the grandmother, the investigation of her home was inconclusive and required further staffing to determine whether it would be appropriate. During unannounced visits to the home, mother was present on three separate occasions and appeared to be living there. Father was arrested for grand theft on March 4, 2021, and detained in the county jail. No DNA testing had been undertaken because father was released on March 22, and the social worker was unable to locate him at his address on file or via his cell phone.

On April 26, 2021, father appeared at the combined sections 388/366.26 hearing, and the juvenile court granted another continuance (to June 7) to complete DNA testing. Father provided his current mailing address.

In an addendum report filed June 2, 2021, the department stated that (1) approval of the grandmother's home was not complete, (2) father had not submitted to DNA

9

testing, and (3) mother "hung up the phone" when the social worker called to inquire about her attendance at the services provided by the department. On June 7, the combined sections 388/366.26 hearing was continued to July 9.

Neither mother nor father appeared on July 9, 2021; father was incarcerated following his arrest for grand theft, mail theft, and drug-related offenses. The juvenile court again continued the combined sections 388/366.26 hearing, ordered the sheriff's department to cooperate with the department to allow DNA testing of father, and ordered that father be physically present at the continued hearing.

According to the section 366.3 postpermanency status review report filed July 14, 2021, mother was living in Rialto with a cousin, remained in a relationship with father, was working full time at a department store, and was working through her postpartum depression with the help of her safety network and friends. Mother was attentive to M.S. during weekly supervised visits, and there were no identified concerns. Nonetheless, the department recommended decreasing visits to once a month due to the concurrent plan of adoption. Father was incarcerated and had not made himself available for an interview or visits with M.S. M.S. was healthy and very active, attached to her caregivers, and continued to thrive in her placement, which was stable and suitable to her needs. The department opined that it was in M.S.'s best interest to remain with her caregivers, who wanted to adopt her.

E.     *Combined Sections 388/366.26 Hearing.*

On July 27, 2021, the juvenile court conducted a hearing on mother's section 388 petition. The grandmother testified that it would be in M.S.'s best interest to live with the

10

grandmother because the child's "brothers are there. It's a loving home. We all can't wait until she's there. She will be well provided for." The grandmother was willing to adopt M.S. and abide by the court's directive regarding who may visit her. The grandmother has 26 grandchildren and lives in a two-bedroom apartment with M.S.'s half brothers and an 18-month-old great-grandchild. Another great-grandchild visits three-to-four days each week. The grandmother had only seen M.S. once since her birth. The matter was continued to August 2.

On August 2, 2021, mother's counsel argued that the grandmother—guardian of M.S.'s two older half brothers—was ready, and her home had been approved for the placement of M.S. Given the preference that a child be placed with siblings, mother requested that M.S. be placed with the grandmother. Both county counsel and the child's counsel opposed the request on the grounds the home was not appropriate, and the grandmother was unable to provide appropriate supervision. More specifically, counsel pointed out the department's concerns about the grandmother's candidness regarding who was actually residing in her home, including an adult who was not to be left alone with any children, and her failure to provide the name of the person who would watch M.S. while the grandmother was at work. Counsel also noted that (1) some family members had admitted to using marijuana in the home, (2) the evidence suggested the grandmother "allows mother to have unsupervised visitation," (3) the grandmother did not notice that mother was under the influence prior to giving birth to M.S., and (4) the grandmother never raised the issue of visitation when she was present in court, despite her claim that she made several requests to the social workers. County counsel argued that the

11

grandmother had not established any type of bond with M.S., and M.S.'s counsel argued the child should remain with the current caregivers with whom she had bonded and where she had thrived. Mother's counsel reiterated that mother had filed the section 388 petition, and the grandmother should not be "penalized for having a number of grandchildren [and] great-grandchildren," and for "facilitat[ing] contact" with mother.

After reviewing the evidence presented, the juvenile court recognized the department's initial intent to place M.S. with the grandmother but noted that "some series of delays and issues" ultimately prevented such placement. When the child's placement changed in December 2020, mother filed the section 388 petition. The court continued the hearing on the petition and ordered the department to investigate whether the grandmother's home could be approved for placement. The court noted that the department's concerns that persisted "for the past year regarding maternal grandmother's house composition and truthfulness in relaying information" prevented the child's placement with the grandmother, and there had been no change in circumstance. The court added that if it did see a change, "the only change would be that now maternal grandmother's home is approved conditionally." After finding that it was not in the child's best interest to change placement, the court denied mother's petition.

Proceeding with the section 366.26 hearing, the department requested the juvenile court order a permanent plan of adoption for M.S. Mother's counsel asked the court to apply the beneficial parent-child relationship exception under section 366.26, subdivision (c)(1)(B)(i) and select a plan of guardianship. Father read a letter he had written. He explained that he was afraid to take a paternity test because his addiction to

12

methamphetamine made him think mother was unfaithful to him, and he was "terrified to find out the truth." Father's counsel asked the court to allow father a chance to reunify with M.S. or select a less permanent plan such as legal guardianship.

The juvenile court found that mother had met the first prong (regular visitation) but not the second (that M.S. would benefit from continuing the parent-child relationship), and neither parent met the burden necessary to apply the beneficial parent-child relationship exception. Thus, it terminated their parental rights and ordered adoption as the permanent plan.

## II. DISCUSSION

Mother argues the juvenile court erred in failing to apply the beneficial parent-child relationship exception to the termination of her parental rights under section 366.26, subdivision (c)(1)(B)(i).[4] We disagree.

At a permanency planning hearing, once the juvenile court finds by clear and convincing evidence that a child is likely to be adopted within a reasonable time, the court is required to terminate parental rights and select adoption as the permanent plan, unless the parent shows that terminating parental rights would be detrimental to the child under one of several statutory exceptions. (*In re Bailey J*. (2010) 189 Cal.App.4th 1308, 1314.) One exception is the beneficial parent-child relationship exception. (§ 366.26, subd. (c)(1)(B)(i).) Last year, our Supreme Court examined this exception and held that a

---

[4] Father joins in mother's argument. He also asserts, "if the judgment terminating the mother's parental rights is reversed, the judgment terminating the father's parental rights must be reversed as well."

drug-addicted parent's failure to succeed in drug rehabilitation programs and continuing struggles with addiction did not, on its own, disqualify the parent from being accorded the beneficial parent-child relationship exception. (*In re Caden C.* (2021) 11 Cal.5th 614, 637-641 (*Caden C.*).) In other words, unless the factors that led to the dependency in the first place also bear on the question of whether a child would benefit from continuing the relationship and be harmed, on balance, by losing it, they are irrelevant. (*Id.* at p. 638.)

To show the beneficial parent-child relationship exception applies, the parent bears the burden of establishing three elements: (1) "regular visitation and contact with the child," (2) "the child has a substantial, positive, emotional attachment to the parent," and (3) "that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 636; see § 366.26, subd. (c)(1)(B)(i).) If all three elements have been established, the exception applies, and the court should select a permanent plan other than adoption. (*Caden C.*, at pp. 636-637.) "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350, disapproved on another ground in *Caden C.*, at p. 636, fn. 5.)

In *Caden C.*, the Supreme Court clarified that a "'hybrid'" standard of review applies to the beneficial parent-child relationship exception. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-641.) The first two elements are primarily factual, reviewed for substantial evidence. (*Id.* at pp. 639-640.) On the third element, the "court makes the

14

assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home." (*Id*. at p. 640.) Thus, any factual determinations underlying the juvenile court's evaluation would also be reviewed for substantial evidence, but the court's ultimate balancing of the detriment of severing the parent-child relationship against the benefits of adoption is reviewed for abuse of discretion. (*Id*. at pp. 640-641.)

In the present case, there is no question mother established the first element of the beneficial parent-child relationship exception, as she consistently visited M.S. (§ 366.26, subd. (c)(1)(B)(i).) Thus, the issue before us is whether she met her burden on the other elements of the exception. We do not agree the evidence favoring her position bound the juvenile court to find that the exception applied or that this is one of the extraordinary cases where the exception should have been applied. Contrary to mother's suggestion, the quality of her visits (mother focused on M.S.'s needs, M.S. was happy to see mother and fell asleep in her arms) does not lead inevitably to a finding that the beneficial parent-child relationship exception applies.

To prove the second element, mother needed to show that M.S. has a "substantial, positive, [and] emotional attachment to [her]—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C*., *supra*, 11 Cal.5th at p. 636.) In other words, was the attachment "significant" such that it conferred more than "some incidental benefit" to the child. (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 575; see *Caden C*. at pp. 632-633.) According to *Caden C*., "the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the

15

portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.] . . . [C]ourts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.] Doing so properly focuses the inquiry on the child, even as courts must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern. [Citations.] Certainly, it is not necessary . . . to calibrate a precise 'quantitative measurement of the specific amount of "comfort, nourishment or physical care" [the parent] provided during [his or] her weekly visits.' [Citation.] . . . [O]ften expert psychologists who have observed the child and parent and can synthesize others' observations will be an important source of information about the psychological importance of the relationship for the child." (*Caden C.*, *supra*, 11 Cal.5th at pp. 632-633.)

According to mother, the juvenile court applied the wrong legal standard in assessing this element. (See, e.g., *In re B.D.* (2021) 66 Cal.App.5th 1218, 1228 [The court improperly relied "on the fact that the parents had not completed their reunification plans and were unable to care for the children based on their long-term and continued substance abuse" rather than "examine how the parents' continued substance abuse impacted the nature of the parent-child relationship."]; *In re D.M.* (2021) 71 Cal.App.5th 261, 271 ["The court's express findings that father did not act like a parent demonstrate it considered factors which *Caden C.* has explained are inappropriate in determining whether the parental-benefit exception applies."].) At the hearing, the court stated, "But in looking at mother's role as a parent, day-to-day contact from a parent standpoint in

16

terms of the minor child, I feel the second prong is lacking. I do believe that the best interest of the minor is in her continued placement with the permanent plan of adoption." Considering the court's comments, it appears that the court relied on a factor—parental role—which is no longer appropriate. (See *B.D.*, at p. 1230 [reversing order terminating parental rights because it was unclear how much weight the court placed on its conclusion that the parents did not occupy a "parental role" in their children's lives]; *In re J.D.* (2021) 70 Cal.App.5th 833, 864-865 [same]; *D.M.*, at pp. 270-271 [same].) Nonetheless, mother failed to carry her burden of establishing the kind of attachment necessary to find that "the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.)

Under the circumstances of this case, mother had a very short window (the first year of M.S.'s life) in which to develop a relationship with her child. M.S. was detained soon after birth and removed from mother's care. By the time of the section 366.26 hearing, she was almost 13 months old and had never lived with mother other than their time in the hospital during the days following her birth. M.S. was too young to comment on her relationship with mother and, thus, it was up to mother to create the bond necessary to establish a beneficial parent-child relationship. Since mother's visitation did not become consistent until January 2021—visits during the first six months of M.S.'s life were "sporadic"—the time available to create such a relationship was approximately seven months. While mother may have bonded to M.S. during this time, when evaluating the benefit of the parent-child relationship, the focus is on the child. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) Viewing the benefit of the parent-child relationship through M.S.'s

17

eyes, we conclude there was no substantial evidence to support a finding that she has a "substantial, positive, [and] emotional attachment" to mother such that she (M.S.) would benefit from continuing the relationship. (*Caden C*., at p. 636.)

Even if we assume mother did establish the first and second elements of the beneficial parent-child relationship exception, she failed to show that the harm caused by terminating mother's parental rights outweighed the benefits of providing M.S. a permanent adoptive home.[5] At this stage of the proceedings, the court "must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Caden C*., *supra*, 11 Cal.5th at p. 632.) In other words, "[w]hen the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Id*. at pp. 633-634.)

Here, there is no evidence that M.S. would suffer any harm from terminating her relationship with mother. M.S. was thriving in her caregivers' home where she appeared to be "well adjusted." She was one year old, had spent her entire life outside mother's care and had never exhibited any signs the separation from mother caused her distress.

---

[5] Mother does not address the third element of the exception, whether termination of the parent-child relationship would be detrimental to the child, in any detail. Rather, mother asserts that the juvenile court never considered this element because it relied on an inappropriate factor in the application of the second element. The court later stated that "[t]ermination of parental rights would not be detrimental to the minor in that none of the exceptions contained in WIC Section 366.26(c)(1)(A and/or B) are applicable in this case."

18

And, while she appeared happy to see mother and fell asleep in her arms,[6] a loving and friendly relationship is "'not enough to outweigh the sense of security and belonging an adoptive home would provide.'" (*In re Jason J.* (2009) 175 Cal.App.4th 922, 938.) At best, the record shows the child had positive interactions with mother, not a "substantial, positive, [and] emotional attachment" to her. (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) Unfortunately for mother, an affectionate relationship with a young child is not what the beneficial parent-child relationship exception was enacted to protect. We do not doubt mother's love for her child, but the record contains no evidence that adoption would be detrimental to M.S.

In short, mother failed to carry her burden of establishing every element of the beneficial parent-child relationship exception. She therefore has not shown that the juvenile court erred when it terminated her parental rights.

---

[6] Mother asserts that M.S.'s strong attachment to her (mother) is evidenced by the department's recommendation to reduce her visits to "once a month due to [the] concurrent plan for [M.S.] being adoption at this time. [She] needs to continue to bond with her [caregivers] without causing additional confusion for the child with having weekly visits with the birth mother." However, the department's recommendation was not based on a strong attachment between mother and M.S. Rather, it was based on the need to not confuse M.S.

## III.  DISPOSITION

The juvenile court's order terminating parental rights is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


McKINSTER
Acting P. J.

We concur:


MILLER
J.


CODRINGTON
J.